```
                UNITED STATES DISTRICT COURT
                         FOR THE
                    DISTRICT OF VERMONT

JOSEPHA W. AUSTIN; ROBIN L.    )
CRUZ; GORDANA POBRIC; and      )
JENNIFER HASELMAN,             )
                               )
     Plaintiffs,               )
                               )
          v.                   )   Case No. 2:23-cv-272
                               )
MONSANTO COMPANY; BAYER        )
CROPSCIENCE L.P.; SOLUTIA,     )
INC.; PHARMACIA, L.L.C.;       )
PHARMACIA, INC.; and           )
PHARMACIA CORP.,               )
                               )
     Defendants.               )
```

## OPINION AND ORDER

Plaintiffs Josepha Austin, Robin Cruz, Gordana Pobric, and Jennifer Haselman bring this action claiming harm resulting from their exposure to polychlorinated biphenyls ("PCBs"). Defendants Monsanto Company, Bayer CropScience, L.P., Solutia, Inc., and Pharmacia L.L.C. (collectively "Monsanto") now move to exclude the expert testimony of Kenneth Spaeth, M.D., Michael H. Shannon, M.D., Lisa Mani, M.D., and Paul F. Rosenfeld, Ph.D. Those witnesses are expected to offer testimony relating to causation. For the reasons set forth below, the motion to exclude is denied.

## Background

The Complaint alleges that Plaintiffs were exposed to PCBs while at Burlington High School in Burlington, Vermont, and have

suffered adverse consequences as a result. Plaintiffs intend to call three medical doctors – Dr. Spaeth, Dr. Shannon, and Dr. Mani – and Dr. Rosenfeld, an environmental scientist. Dr. Rosenfeld intends to testify about the levels of PCBs to which Plaintiffs were exposed and what those exposures likely meant in terms of health risks. The three medical doctors are expected to testify that Plaintiffs' PCB exposures caused their alleged injuries.

Dr. Rosenfeld holds a master's degree in environmental science from the University of California, Berkeley, and a Ph.D. in soil chemistry from the University of Washington. He has spent over 25 years evaluating environmental impacts of various sources of pollution including oil spills, landfills, and agricultural operations. With respect to the effects of such pollution, Dr. Rosenfeld's work has included assessments of impacts on workers and residents. He has authored or co-authored over 30 peer-reviewed publications.

Dr. Spaeth is a physician with a specialization in occupational and environmental medicine. He holds a medical degree from the University of Connecticut, and a master's degree in occupational and environmental health from Harvard School of Public Health. He is currently an Assistant Professor at the Hofstra Northwell School of Medicine, where he serves as the head of the Environmental Health Department. Dr. Spaeth has

spent much of his career treating patients exposed to toxic substances, including PCBs. For ten years he served as the Attending Physician at the World Trade Center Medical Monitoring and Treatment Program, where he diagnosed and treated first-responders. He has completed research on PCBs and has given presentations on the health effects of PCBs in schools. In this case, Dr. Spaeth completed a causation report on each of the four Plaintiffs.

Dr. Mani holds board certifications in both occupational and environmental medicine. She also holds a master's degree in public health from Yale University School of Medicine and Public Health, where she concentrated on chronic diseases. Dr. Mani has over ten years' experience treating patients exposed to PCBs and other toxins. She has also testified in multiple PCB personal injury trials, including school-related PCB litigation brought against Monsanto. In this case, she issued a 90-page report in which she concluded "to a reasonable degree of medical certainty" that exposure to PCBs and related toxins caused, and continue to cause, Ms. Pobric's adverse health issues.

Dr. Shannon is a board-certified physician in internal medicine and endocrinology. He completed reports on two Plaintiffs, Ms. Haselman and Ms. Pobric, each of whom claim thyroid-related injuries. His reports conclude "to a reasonable

degree of medical certainty" that PCB exposure was a significant cause of each Plaintiff's thyroid-related disease.

Monsanto's primary criticism with respect to each of these witnesses is that they failed to properly consider "dose." More specifically, Monsanto claims that none of these experts considered or analyzed the dose of PCB exposure necessary to cause Plaintiffs' medical conditions. According to Monsanto, "Plaintiffs must establish both that the substance in question is *capable* of causing the type of injury alleged *at a particular dose*, and that the plaintiff was exposed to the substance *at or above that dose* (*i.e.* in a quantity sufficient to cause their particular injury)." ECF No. 211 at 8.

Plaintiffs contend that Monsanto's focus on dose misconstrues the law, that PCBs have long been considered harmful, and that the known level and duration of PCB exposure can provide a reliable basis for determining causation. Plaintiffs also submit that Dr. Rosenfeld's report directly addressed dose by estimating level of exposure, and that the medical experts properly based their causation opinions on Plaintiffs' long-term exposures to high levels of PCBs.

## Discussion

Federal Rule of Evidence 702 governs the admissibility of expert testimony. The Rule provides that a witness who is qualified may testify in the form of an opinion or otherwise if

4

the proponent demonstrates to the Court that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Supreme Court has held that, for expert testimony to be admissible under Rule 702, it must satisfy three requirements: (1) the expert witness must be qualified; (2) the testimony must be reliable; and (3) the testimony must be relevant. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-91 (1993). Under the *Daubert* standard, the trial court "functions as the gatekeeper for expert testimony." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997). As the Rule indicates, the proponent of expert testimony has the burden of establishing that the admissibility requirements are met by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10.

### I.  The Question of Dose

Monsanto submits that "a central tenet of toxicology" is that "the dose makes the poison." ECF No. 211 at 5 (citing Fed. Jud. Ctr., REF. MAN. OF SCI. EVID., REF. GUIDE ON EPIDEMIOLOGY 603, n.160, 636, 669 (3d ed. 2011)). Accordingly, some courts have held that causation testimony in a toxic tort case must identify

5

the level at which a chemical has been proven to cause harm, known as the "dose-response relationship." *See, e.g., McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005) (citing "the basic methodology that scientists use to determine causation — the dose-response relationship."); *Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996) ("[s]cientific knowledge of the harmful level of exposure to a chemical plus knowledge that plaintiff was exposed to such quantities are minimal facts necessary to sustain the plaintiff's burden)"; *Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1106 (8th Cir. 1996) (holding that a plaintiff must demonstrate "the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance before he or she may recover"). Monsanto argues that none of Plaintiffs' experts establish a dose-response relationship, and that this allegedly fundamental flaw in methodology renders their reports, and concurrently their proposed testimony, unreliable and inadmissible.

The authorities cited by Monsanto do not necessarily govern this case, either as a matter of science or as a matter of law. The Reference Manual cited by Monsanto explains that "[t]he question whether there is a no-effect threshold dose is a controversial one in a variety of toxic substances areas. . . .

6

Even the shape of the dose-response curve – whether linear or curvilinear, and if the latter, the shape of the curve – is a matter of hypothesis and speculation." FED. JUD. CTR., REF. MAN. OF SCI. EVID., REF. GUIDE ON EPIDEMIOLOGY at 603 n.160. One of Plaintiffs' experts, Dr. Spaeth, similarly explains that "not all toxicants affect the body in a typical dose-response. Some toxicants function in non-threshold, non-linear fashion." ECF No. 211-2 at 14.

Dr. Spaeth acknowledges that "the dose makes the poison" has been a basic adage of toxicology since the 1500s. ECF No. 211-2 at 22. He explains, however, that endocrine-disrupting chemicals such as PCBs "have been shown to have significant effects, even greater effects, at low doses compared to higher doses." *Id.* (citing four studies published between 2012 and 2021). He also cites "a robust, and ever-growing body of literature demonstrating that even background levels of PCBs increase the risk of health harm." *Id.* at 22 (citing publications). As discussed below, Dr. Spaeth's opinions on dose, particularly the lack of a dose-response relationship for PCBs, are echoed by Dr. Mani, Dr. Shannon, and by recent literature in the field of endocrinology.

Monsanto's citations to Second Circuit precedent do not fully support its contention that causation opinions require a dose-response relationship. In *Ruggiero v. Warner-Lambert Co.*,

7

424 F.3d 249 (2d Cir. 2005), the court considered a doctor's opinion that the decedent died of liver disease as a result of taking the drug Rezulin. In reaching that conclusion, the doctor offered no evidence that Rezulin could cause cirrhosis of the liver, and instead relied on a "differential diagnosis" whereby he ruled out the likelihood of other potential causes. *Ruggiero*, 424 F.3d at 251. The Second Circuit affirmed the district court's exclusion of that testimony, holding that "[w]here an expert employs differential diagnosis to 'rule out' other potential causes for the injury at issue, he must also 'rule in' the suspected cause, and do so using scientifically valid methodology." *Id*. at 254 (internal quotation marks and citations omitted). Here, Plaintiffs' experts do not rely exclusively on differential diagnoses, and instead cite a wide body of literature documenting the health impacts – including ailments alleged by the Plaintiffs – associated with PCB exposure.

Monsanto also cites *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002), in which the Second Circuit affirmed the district court's exclusion of expert testimony regarding both general causation and the plaintiff's specific condition. On the question of general causation, the district court found that the proposed expert "failed to apply his own methodology reliably," excluding certain variables from his final calculation. *Amorgianos*, 303 F.3d at 268. In excluding

8

testimony from the plaintiff's treating physician, the district court found that the published articles on which she relied did not match the plaintiff's length of exposure, the solvents at issue, or the alleged symptoms. *Id.* at 270. The *Amorgianos* decision did not specifically discuss dose or the dose-response relationship.

Rather than provide a specific dose at which PCBs can cause harm, Plaintiffs' experts opine that there is no safe dose of PCB. *See* ECF No. 206-2 at 40 (Dr. Carpenter's report stating that there is "no 'safe' level" of PCB exposure.); ECF No. 211-2 at 47 (Dr. Spaeth's report stating that "[n]o safe level of exposure to PCBs has been established"). Monsanto argues that the Second Circuit has rejected the "no safe dose" approach to a causation analysis, citing *Wills v. Amerada Hess Corp.*, 379 F.3d 32 (2d Cir. 2004). In *Wills*, an expert sought to testify that the plaintiff's cancer could have been caused by a single exposure to certain toxic chemicals ("benzene and PAHs"), regardless of dose. 379 F.3d at 49. The Second Circuit affirmed the district court's exclusion of the expert's testimony, in part because the "oncogene" or single-dose theory had not been tested or subjected to peer review. *Id.* at 49. In doing so, the Second Circuit noted that the dose-response relationship was the more generally accepted theory of causation in the scientific community. *Id.*

9

The instant case is different from *Wills* in that Plaintiffs are not arguing causation by means of a single exposure, and their experts do not rely on anything analogous to an oncogene theory. Each Plaintiff claims to have spent a significant amount of time in the presence of PCBs at Burlington High School. As discussed below, Plaintiffs' experts considered length of exposure, as well as actual PCB test results, in their analyses. Those considerations alone distinguish this case from the expert testimony considered in *Wills*.

Monsanto argues that Plaintiffs must identify the dose at which PCBs cause injury. Multiple experts will testify, however, that any amount of PCB exposure can be dangerous. The evidence will also reportedly show that Plaintiffs were exposed to varying levels of PCBs for significant periods of time. Plaintiffs' experts will testify to PCB causation generally, and that Plaintiffs' injuries are, to a reasonable degree of medical certainty, attributable to their extended PCB exposures. While the Court leaves it to the trier of fact to determine whether those opinions are persuasive, it will not bar such testimony for failure to identify a precise dose-response relationship for PCBs.

**II.  Dr. Rosenfeld**

Monsanto moves to exclude Dr. Rosenfeld's testimony, in large part because he does not identify a specific dose-response

relationship. ECF No. 211 at 1. Dr. Rosenfeld addresses dose, and the associated risk of disease, insofar as he calculated Average Daily Dose ("ADD") of PCBs for both inhalation of indoor air and ingestion of dust at Burlington High School. His report explains that his ADD calculations used accepted methodologies to integrate a host of variables, including air and dust concentration, inhalation and ingestion rates, and duration of exposure. He then used those ADD results to calculate "hazard quotients" for both cancer risks and non-cancer risks.

Although Monsanto criticizes Dr. Rosenfeld for failing to show a dose sufficient to cause Plaintiffs' alleged injuries, that is not his role. His role is to provide an exposure estimate upon which other experts, primarily medical doctors, can base their opinions as to specific causation. Dr. Rosenfeld's hazard quotients suggest that Plaintiffs have an increased potential for adverse effects. The Court finds that those calculations will likely assist the trier of fact with respect to general causation. *See* Fed. R. Evid. 702(a); *Blanchard v. Goodyear Tire & Rubber*, 30 A.3d 1271, 1274 (Vt. 2011) (requiring both general and specific causation).

Monsanto also criticizes Dr. Rosenfeld's methodology because he uses EPA guidelines and assumptions. Monsanto claims that those tools are not applicable to medical causation. Plaintiffs note that the EPA methodologies have been developed

after considerable research and peer review. Dr. Rosenfeld relies on the EPA standards to determine whether an environmental exposure should be deemed dangerous.

The Court is mindful that "danger" in the context of government regulation is not equivalent to a showing of causation in civil litigation. *See, e.g., In re Agent Orange Product Liability Litigation*, 597 F. Supp. 740, 781 (E.D.N.Y. 1984) (noting that regulatory "risk assessments may lead to control of a toxic substance even though the probability of harm to any individual is small" while, in civil litigation "a far higher probability (greater than 50%)" is required). Nonetheless, the EPA has, according to Plaintiffs, established the preeminent test protocols for toxic environments. Use of such testing may be probative.

As Dr. Spaeth explains in his report, EPA benchmarks are used routinely not just for groups, but also to assess individual burdens. ECF No. 226-31 at 29. In the case of one plaintiff, for example, Dr. Rosenfeld calculated the "risk of non-cancer health effects to be over 7 times in exceedance of public health thresholds for when health risk is considered acceptable." *Id.* at 43. Given the other evidence regarding the risks associated with exposure to PCBs, as well as the consideration given to length of exposure, such a measure is both relevant and, because the methodologies have been shown to

12

be sound, reliable. *See* Fed. R. Evid. 702(c) (requiring that expert testimony be the product of reliable principles and methods).

Monsanto next argues that Dr. Rosenfeld's contamination data is flawed because he used building averages, rather than room-by-room analyses. Those measurements were provided by Plaintiffs' expert Kevin Coghlan. Coghlan concluded, based upon analysis of over 100 samples, that Burlington High School had widespread PCB contamination. ECF No. 226-15, 68-91. As the Court found previously, Coghlan's methods may be critiqued, but because Plaintiffs showed by preponderance of the evidence that his data was sufficient and his methodology was reliable, those criticisms do not render his testimony inadmissible. ECF No. 258 at 12. The same holds true for Dr. Rosenfeld's incorporation of Coghlan's work.

Dr. Rosenfeld's report also explains that for non-cancer risk assessments, he used specific classroom data where available. ECF No. 226-30 at 14. If such data was not available, he used the Upper Confidence Limit ("UCL"), which "provides an estimate of the reasonable maximum exposure by considering the highest concentrations that could reasonably occur, even if not the absolute maximum." *Id.* If a UCL could not be calculated, Dr. Rosenfeld used average building concentration. *Id.* Plaintiffs submit that where contamination is pervasive, using building-

wide concentrations is an accepted method, particularly in a case such as this where tracking in individual's precise location over a period of years was not possible. Having reviewed Dr. Rosenfeld's report, the Court finds that his approach was sufficiently supported and reliable for his testimony to be presented to a jury.

In sum, for purposes of Rule 702, the Court finds Plaintiffs have shown by a preponderance of evidence that Dr. Rosenfeld is qualified, that his testimony is based on sufficient facts and data, that he used reliable principles and methods, and that his testimony will reflect a reliable application of those principles and methods to the facts of the case. *See* Fed. R. Evid. 702. The Court also finds that his testimony will help the trier of fact understand the evidence or determine certain facts at issue. *See id.*  The motion to exclude his testimony is therefore denied.

### III. Dr. Spaeth

Monsanto does not challenge Dr. Spaeth's qualifications. The primary argument for excluding his testimony again relates to dose. Monsanto argues that Dr. Spaeth's failure to cite a dose-response relationship is critical and that reliance on a "no safe dose" theory is flawed. Although Dr. Spaeth does note that no safe level of PCB exposure has been established, that is not the basis for his conclusions. His specific causation

analyses instead center on the duration of Plaintiffs' exposures; the estimated levels of PCBs to which were reportedly exposed; their medical reports; and the scientific literature connecting PCB exposure to certain illnesses and conditions.

Plaintiffs' briefing highlights, as an example, Dr. Spaeth's analysis of Ms. Austin. Dr. Spaeth noted that Ms. Austin spent a minimum of 140 to 210 minutes per day, five days a week, in Building F between August 2015 and June 2017. She spent that same amount of time, though four days a week, in Building F between August 2018 and the time the school was shut down. Dr. Spaeth reviewed Ms. Austin's prior medical history, neuropsychological testing as reported by Dr. Gayle Morse, and Dr. Rosenfeld's assessment of Ms. Austin's risk level. Dr. Spaeth's analysis also considered known impacts of PCB exposure, noting "an abundance of both experimental and epidemiological data demonstrating exposure to PCBs causes neurological, neurocognitive and neuropsychiatric harm." His literature review not only cited sources, but also discussed specific studies and their findings. Finally, he considered other possible causes of Ms. Austin's alleged injuries. ECF No. 226-31 at 32-48.

Monsanto refers the Court to a separate toxic exposure case in which Dr. Spaeth's testimony was excluded. *See Hostetler v. Johnson Controls, Inc.*, No. 3:15-CV-226 JD, 2020 WL 5543081, at *6 (N.D. Ind. Sept. 16, 2020). The *Hostetler* court found that,

15

when determining the plaintiffs' risk of suffering certain effects from chemical exposure, "all [Dr. Spaeth did] was note various regulatory levels . . . the sampling data and . . . estimates about the indoor air concentrations in the Plaintiffs' homes. . . . [He did] not consider the duration of any of the Plaintiffs' exposures so as to compare them to the regulatory levels, either." *Id.* Plaintiffs distinguish *Hostetler* by noting that, in that case, the plaintiffs had not yet suffered any harm and Dr. Spaeth was not offering an opinion on specific causation. Moreover, in the instant case, Dr. Spaeth addressed dose by considering both the tested PCB levels and the duration of each Plaintiff's exposure. His work in *Hostetler* apparently involved no such analyses and was thus excluded.

The Court finds that Dr. Spaeth's testimony, to the extent discussed in the party's filings, is admissible. Plaintiffs have shown by a preponderance of evidence that Dr. Spaeth is qualified, that the data on which he relies is sufficient, that he applies reliable principles and methods in his review of both the data and the relevant literature, and that his opinion reliably applies those principles to the facts presented and will assist the trier of fact.

**IV. Dr. Mani**

Dr. Mani published a 90-page report relative to this case, with over 200 pages of supporting citations. Monsanto does not

contest her qualifications or her opinions on general causation. Dr. Mani's specific causation conclusions apply to Ms. Pobric.

Monsanto's argument for excluding Dr. Mani's testimony focuses once again on the lack of a specific dose-response relationship. Dr. Mani addressed Monsanto's concern in her deposition, explaining that "PCBs often show manifestation at nonmonotonic or nondose-response levels, very low levels, so they're not predictable on that dose-response S-shaped curve." ECF No. 226-39 at 3. When asked specifically about the "dose needed to cause any of the health effects that you've attributed to PCBs for Ms. Pobric," Dr. Mani stated that "I don't think it's just so formulaic in path as to say that there's a certain dose. I think you have to look at her exposure over 10, 15 years part-to full-time. . . . There's no magic number." *Id.* at 11.

Monsanto criticizes Dr. Mani for testifying in a separate case that "the higher the dose, the more response you'd expect to see." ECF No. 211 at 19. That statement is not necessarily inconsistent with her deposition testimony, which merely characterized the dose-response level of PCBs as not entirely predictable. *Id.* at 3. Furthermore, Dr. Mani's past testimony is consistent with the opinion of one of Plaintiffs' other experts, Dr. Carpenter, who stated that while even low dose exposure may be harmful, "the greater the exposure the greater the risk and the longer one is exposed to greater the risk increases." ECF

17

No. 206-2 at 40. The Court does not find that Dr. Mani's past testimony undermines any opinions or conclusions she has expressed in this case.

Dr. Mani's report indicates that she conducted a thorough literature review; reviewed relevant data with respect to PCB levels at Burlington High School; considered the duration of Ms. Pobric's PCB exposures at Burlington High School and elsewhere; examined Ms. Pobric's full medical history; considered other possible causes of the alleged ailments; and concluded that Ms. Pobric's conditions "are most consistent with PCB and allied toxin or chemical exposures." As with Dr. Spaeth, the Court finds that Dr. Mani's data and methodologies were both sufficient and reliable, and that Plaintiffs have otherwise carried their burden as required under Rule 702. *See* Fed. R. Evid. 702.

## V. Dr. Shannon

Dr. Shannon is an endocrinologist. Monsanto criticizes Dr. Shannon for not adequately considering dose. As Dr. Spaeth explained, however, endocrine-disrupting chemicals such as PCBs do not show a linear dose-response relationship. Plaintiffs' briefing cites a publication from the Endocrine Society, which states that "[c]ommon concepts of classical regulatory toxicology, such as potency and threshold [] do not easily transfer to the non-monotonic behaviour of [endocrine-disrupting

18

chemicals]." ECF No. 226 at 93 (citing Endocrine Society Position Statement). Plaintiffs also cite Dr. Shannon's prior testimony in a separate case, in which he explains that

> endocrinologists now believe a shift away from traditional toxicity testing is needed. The prevailing dogma applied to chemical risk assessment is that, quote, the dose makes the poison, closed quote. These testing protocols are based on the idea that there is always a simple, linear relationship between dose and toxicity, with higher doses being more toxic and lower doses less toxic. . . . A new type of testing is needed in order to reflect that [endocrine-disrupting chemicals] impact human health even at low levels encountered in everyday life.

*Id.* at 93-94 (citing Dr. Shannon's testimony in *Burke v. Pharmacia, et al.*). This "paradigm shift" finds support in recent peer-reviewed literature. *See id.* (citation omitted).

Dr. Shannon's specific causation conclusions mirror those of Dr. Spaeth and Dr. Mani. Briefly stated, his experience, his review of the literature, an examination of the Burlington High School data and the medical records, as well as the work histories of Plaintiffs Haselman and Pobric, led him to believe that PCBs were a significant cause of those Plaintiffs' alleged injuries. Having reviewed his reports and the parties' briefing, the Court finds that Plaintiffs have met the requirements of Rule 702. Specifically, the Court finds Plaintiffs have shown by a preponderance of evidence that Dr. Shannon is qualified; that his testimony is based on sufficient facts and data; that he used reliable principles and methods; that his opinions will

19

reflect a reliable application of those principles and methods to the facts of the case; and that his testimony will help the trier of fact. *See* Fed. R. Evid. 702.

## Conclusion

For the reasons set forth above, Monsanto's motion to exclude the opinions and testimony of Kenneth Spaeth, M.D., Lisa Mani, M.D., Michael Shannon, M.D., and Paul Rosenfeld, Ph.D. (ECF No. 211) is denied.

DATED at Burlington, in the District of Vermont, this 1st day of December 2025.

/s/ William K. Sessions III
Hon. William K. Sessions III
U.S. District Court Judge