UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

JOSEPHA W. AUSTIN; ROBIN L.    )
CRUZ; GORDANA POBRIC; and     )
JENNIFER HASELMAN,              )
                                    )
    Plaintiffs,             )
                                    )
       v.                       )    Case No. 2:23-cv-272
                                    )
MONSANTO COMPANY; BAYER       )
CROPSCIENCE L.P.; SOLUTIA,    )
INC.; PHARMACIA, L.L.C.;      )
PHARMACIA, INC.; and          )
PHARMACIA CORP.,              )
                                    )
    Defendants.            )

## OPINION AND ORDER

Plaintiffs Josepha Austin, Robin Cruz, Gordana Pobric, and Jennifer Haselman bring this action claiming harm resulting from their exposure to polychlorinated biphenyls ("PCBs"). Defendants Monsanto Company, Bayer CropScience, L.P., Solutia, Inc., and Pharmacia L.L.C. (collectively "Monsanto") now move to exclude the testimony of Dr. Gayle Morse. Plaintiffs intend to call Dr. Morse to testify about cognitive injuries they allegedly suffered as a result of PCB exposures. For reasons set forth below, Monsanto's motion to exclude is denied.

## Background

The Complaint alleges that Plaintiffs were exposed to PCBs while at Burlington High School in Burlington, Vermont, and have suffered adverse consequences as a result. Plaintiffs intend to

call Dr. Morse to testify about cognitive injuries they allegedly suffered as the result of their exposures to PCBs. Dr. Morse is a licensed psychologist and neuropsychologist in New York State. She holds a doctorate in counseling psychology and is a tenured professor at Russell Sage College, where she serves as the internship director of the mental health counseling and community program. She currently teaches psychology courses and maintains a private clinical practice.

Dr. Morse has been involved in PCB research since 1994. Her work has included multiple studies on the impacts of PCBs on members of the Akwesasne Mohawk Tribe. That work reportedly included the neuropsychological testing of hundreds of people who were exposed to PCBs. Dr. Morse has authored several peer-reviewed articles on the effects of PCB exposure on human populations, and has testified that one of her projects revealed evidence of adverse effects of PCBs on human neuropsychological functioning.

In this case, Dr. Morse is expected to testify that Plaintiffs suffer from various cognitive conditions, due in significant part to PCB exposures. She will testify about each Plaintiff's background and health issues, their alleged PCB exposures, and her interpretations of subsequent neuropsychological testing. In her expert report, Dr. Morse concludes, "with a reasonable degree of medical/scientific

certainty, that the above exposures to PCBs are consistent with [Plaintiffs'] injuries and that said PCB exposures were a significant contributing cause to their cognitive conditions." ECF No. 226 at 90 (Plaintiff's unsealed response to the motion to exclude, citing Dr. Morse's report).

Monsanto's motion to exclude Dr. Morse's testimony notes that Plaintiffs' neuropsychological testing was administered by a different practitioner, Dr. Eric Mart. Dr. Mart will not be testifying. Monsanto argues that Dr. Morse is unqualified to assess Dr. Mart's work because she has little experience administering neuropsychological testing. Monsanto also contends that Dr. Morse has almost no experience diagnosing mental or cognitive conditions caused by chemical exposure, and that she failed to fully consider potential alternative causes of Plaintiffs' cognitive conditions. Finally, Monsanto criticizes Dr. Morse – as it does other experts in this case – for ignoring the so-called "dose-response relationship" as she provides no information about the levels of PCB exposure capable of causing Plaintiffs' alleged injuries.

Plaintiffs respond that Dr. Morse is sufficiently familiar with neuropsychological testing through her research, and that her incorporation of tests performed by Dr. Mart is consistent with the work of other medical professionals who utilize third-party testing to evaluate patients. Plaintiffs also submit that

3

by reviewing the reports of other experts, including those who have offered opinions about the levels of PCBs to which Plaintiffs were allegedly exposed, Dr. Morse is qualified to form a reliable opinion as to the cause of the alleged cognitive conditions.

## Discussion

Federal Rule of Evidence 702 governs the admissibility of expert testimony. The Rule provides that a witness who is qualified may testify in the form of an opinion or otherwise if the proponent demonstrates to the Court that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Supreme Court has held that, for expert testimony to be admissible under Rule 702, it must satisfy three requirements: (1) the expert witness must be qualified; (2) the testimony must be reliable; and (3) the testimony must be relevant. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-91 (1993). Under the *Daubert* standard, the trial court "functions as the gatekeeper for expert testimony." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997). As the Rule

indicates, the proponent of expert testimony has the burden of establishing that the admissibility requirements are met by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10.

Monsanto's challenge to Dr. Morse focuses on her qualifications and the reliability of her conclusions. With respect to her qualifications, Monsanto notes that Dr. Morse spends most of her professional time working in academia, with her clinical practice occupying only one day per week. Within her clinical practice, she generally treats people with severe psychopathology such as schizophrenia or long-term trauma. In her deposition testimony, she distinguished her practice from that of a neuropsychologist. She also testified that she performs neuropsychology evaluations approximately twice a year.

Monsanto criticizes Dr. Morse for not being board certified in neuropsychology. The Court finds that board certification is only relevant in the context of an expert's other qualifications. *See, e.g., Est. of Goldberg v. Nimoityn*, 193 F. Supp. 3d 482, 491 (E.D. Pa. 2016) (holding that "an otherwise qualified physician can render an opinion about the standard of care . . . even in the absence of board certification"). "Courts in the Second Circuit liberally construe the expert qualifications requirement, and generally will not exclude expert testimony provided 'the expert has educational and experiential qualifications in a general field closely related

5

to the subject matter in question.'" *I.M. v. United States*, 362 F. Supp. 3d 161, 192 (S.D.N.Y. 2019) (quoting *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007)). The lack of board certification, standing alone, is not disqualifying.

    Dr. Morse concedes that she is not a neuropsychologist, and that she only conducts such testing occasionally. She testified in her deposition that her teaching courseload includes classes on ethics and mental health law, as well as a class on diagnostic psychopathology. Her clinical practice, as noted, focuses on severe mental health issues. She has previously testified as an expert in other cases, yet those have been limited to criminal and immigration matters. When asked whether she had prior experience evaluating psychological issues stemming from chemical exposures, Dr. Morse testified that over twenty years ago she treated an individual who had a history of working with a cleaning solvent.

    The neuropsychological tests in this case were administered by Dr. Mart. Monsanto does not challenge his qualifications to perform and interpret such testing. Monsanto nonetheless has questions, such as how long Dr. Mart spent on each interview and what topics were covered. In her deposition, Dr. Morse was not able to answer those questions. Monsanto submits that Dr. Morse

6

did not receive any of Dr. Mart's raw test data, and therefore cannot opine about the accuracy of Dr. Mart's interpretation.

A court may "preclude proffered witnesses who simply aggregate or recite the opinions of others, especially if they are not qualified in the field in which they opine. A metallurgist may testify as to metallurgy; a chemist as to chemistry. They cannot speak for each other." *In re M/V MSC Flaminia*, No. 12 Civ. 8892 (KBF), 2017 WL 3208598, at *2 (S.D.N.Y. July 28, 2017). Here, Dr. Morse is not testifying outside her area of expertise. Nor is she merely relaying the opinion of Dr. Mart. Indeed, there is no suggestion that Dr. Mart formed any sort of opinion regarding the impact of PCBs. Instead, it is Dr. Morse who independently reviewed the test results and formed an opinion about how those results align with her knowledge about the potential impacts of PCB exposure.

Dr. Morse has significant experience with PCB studies and PCB literature. She also has experience with neuropsychological data as a result of her work with the Akwesasne Mohawk Tribe. That work involved reviews of testing data and analysis of health impacts from PCBs. Dr. Morse has published several peer-reviewed works on the damaging effect of PCBs on human populations. Her work in this case is consistent with that experience.

Dr. Morse reviewed not only Dr. Mart's test results, but also the reports of Plaintiffs' experts Kevin Coghlan, who generated data regarding PCB levels at Burlington High School, and Dr. Paul Rosenfeld, who opined on the level of hazard resulting from those PCB levels. She further reviewed the report generated by Dr. David Carpenter, with whom she has worked in the past and who offered his opinion as to general causation. In the course of preparing her own report, Dr. Morse interviewed each Plaintiff. Applying her professional knowledge, Dr. Morse developed opinions about the individual health impacts of PCB exposures. Her report explicitly states that she considered other possible causes of Plaintiffs' conditions, and that she reached her conclusions with a reasonable degree of medical or scientific certainty.

Monsanto is critical of Dr. Morse's use of Plaintiffs' "premorbid functioning" as a tool for determining that PCBs played a role in causing their conditions. That criticism ties into Monsanto's argument that Dr. Morse's differential diagnosis (ruling out causes other than PCBs) was insufficient. In her deposition, Dr. Morse explained that she was not able to rule out the impact of all other factors, such as one Plaintiff's tuberculosis or another's thyroid condition, since she is not a physician. ECF No. 209-3 at 26-27. Aside from those issues, she was able to compare the Plaintiffs' abilities and achievements

8

prior to their time at Burlington High School with their abilities after their respective PCB exposures, note the differences, and opine as to cause. Her caveats about certain medical conditions do not undermine her methodologies, and instead leave room for cross-examination and argument regarding her conclusions.

Monsanto compares this case to *Mancuso v. Consolidated Edison Company of New York*, 967 F. Supp. 1437, 1456-57 (S.D.N.Y. 1997), in which the court barred a clinical psychologist from testifying "that PCBs caused the ailments she diagnoses in [Plaintiff]. Dr. Dietrich is not a medical doctor, much less an expert on the effects of exposure to PCBs." Unlike the psychologist in *Mancuso*, Dr. Morse has significant experience studying the effects of exposure to PCBs. She also reviewed the relevant literature and had the benefit of Dr. Carpenter's report on general causation.

Monsanto's final criticism of Dr. Morse is that she does not identify the dose at which PCBs could be expected to cause the conditions discussed in her report. The Court addresses the "dose-response relationship" in its ruling on Monsanto's motion to exclude Plaintiffs' medical experts. Briefly stated, more than one expert in this case has offered the opinion that the dose-response relationship for PCBs may be nonlinear, and even non-threshold. At times, lower doses may have greater impacts,

9

while even background levels of PCB have been shown to cause harm. *See, e.g.,* ECF No. 211-2 at 14; ECF No. 226 at 93-94.

The Court therefore finds, based on the record before it and the arguments presented by the parties, that Dr. Morse may offer her opinions. Plaintiffs have shown by a preponderance of the evidence that she is qualified and that the data on which she is relying, which includes both neurological testing and PCB exposure estimates, is sufficient and reliable. Moreover, Plaintiffs have carried their burden of showing that Dr. Morse is applying reliable methodologies based on her significant experience with PCB studies, that she reliably applied accepted principles and methodologies to the facts of this case, and that her testimony will assist the trier of fact. *See* Fed. R. Evid. 702.

## Conclusion

For the reasons set forth above, Monsanto's motion to exclude the testimony of Gayle Morse, Ph.D., (ECF No. 209) is denied.

DATED at Burlington, in the District of Vermont, this 1st day of December 2025.

/s/ William K. Sessions III
Hon. William K. Sessions III
U.S. District Court Judge