UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

JOSEPHA W. AUSTIN; ROBIN L.    )
CRUZ; GORDANA POBRIC; and      )
JENNIFER HASELMAN,             )
                               )
     Plaintiffs,               )
                               )
          v.                   )    Case No. 2:23-cv-272
                               )
MONSANTO COMPANY; BAYER        )
CROPSCIENCE L.P.; SOLUTIA,     )
INC.; PHARMACIA, L.L.C.;       )
PHARMACIA, INC.; and           )
PHARMACIA CORP.,               )
                               )
     Defendants.               )

## OPINION AND ORDER

Plaintiffs Josepha Austin, Robin Cruz, Gordana Pobric, and Jennifer Haselman bring this action claiming harm resulting from their exposure to polychlorinated biphenyls ("PCBs"). Defendants in the case are Monsanto Company, Bayer CropScience, L.P., Solutia, Inc., and Pharmacia L.L.C. (collectively "Monsanto"). Before the Court is Monsanto's motion for summary judgment. For reasons set forth below, the motion is denied.

## Factual Background

This case centers on Plaintiffs' claims of harm resulting from their exposure to PCBs at Burlington High School ("BHS") in Burlington, Vermont. Josepha Austin and Robin Cruz worked as special education teachers at BHS from 2015 to 2020. Jennifer Haselman worked as a special educator at the school from 2016 to

2019. Gordana Pobric was a math teacher at BHS from 2005 to 2020. BHS closed in 2020 after testing detected the presence of PCBs in its buildings.

Monsanto was effectively the sole manufacturer of PCBs in the United States from 1935 to 1977. PCBs had certain qualities that made them commercially useful, including being relatively insoluble in water, nonflammable, strong electrical insulators, and effective cooling agents. Consequently, PCBs can be found in applications such as transformers, plasticizers, hydraulic fluids, flame retardants, and adhesives. PCBs were also used in oils, paints, waxes, and solvents for caulk and other compounds.

As a general matter, most commercial applications for PCBs involved either "closed" or "open" use. A transformer is an example of a closed use, while caulk and paint are examples of open uses. A third category, "nominally closed" or "semi-closed" systems would include products such as hydraulic fluids. Monsanto stopped selling PCBs for open uses in 1970, and stopped manufacturing PCBs altogether in 1977. The Environmental Protection Agency ("EPA") banned PCBs in 1979.

Plaintiffs contend that when materials containing PCBs break down over time, PCB-containing dust can be released into the air. PCBs may then enter the body through inhalation and absorption through the skin. Plaintiffs further allege that PCBs are "bio-accumulative in the human body and travel to all

2

organs, including the brain." ECF No. 250 at 5. Various organizations, including the EPA, have concluded that PCBs are likely carcinogenic. In 2013, the World Health Organization noted that "[t]here are some very strong datasets, for PCBs, showing that environmentally relevant exposures to these endocrine disrupting chemicals caused cognitive and behavioural [sic] deficits in humans." ECF No. 243-5 at 6.

Monsanto notes that exposure levels will vary depending on the circumstances, including the volatility of the congeners, with highly chlorinated congeners being generally less volatile and thus more resistant to decomposition. Monsanto also submits that dose – the amount of chemical that enters the body and is taken up by organs and tissues – depends on how the chemical enters the body. In response to Plaintiffs' claim that PCBs are carcinogenic, Monsanto offers its critique that the allegation "relates to unidentified PCB congeners at unidentified doses and unidentified durations of exposure." ECF No. 250 at 4.

Monsanto-manufactured PCBs were known as Aroclors. Monsanto reports that it sold Aroclors and mixtures of Aroclors with other compounds under various brand names. The company contends that it did not sell Aroclors as end-use products, and instead sold to customers who developed products using PCBs. Accordingly, while Plaintiffs submit that Monsanto sold PCBs for

use in buildings that included schools, Monsanto contends that
it never sold PCBs directly to schools.

Monsanto further argues that not all PCBs detected in
building materials or dust are attributable to Aroclor use, and
that some congeners may derive from other chemical sources or
manufacturing by-products. Monsanto also contends that the
concentration of volatile materials may vary depending on
certain circumstances such as room size, product loading level,
and air flow. With respect to the allegations in this case,
Monsanto argues that the presence of failing building materials
at BHS was at least in part the result of inattention and
negligence by the Burlington School District, and that such
negligence acted as an intervening and superseding cause of
Plaintiffs' alleged harms.[1]

The BHS buildings at issue were constructed between 1963
and 1965. The campus consisted of several buildings (Buildings A
through F) connected by walkways. In 2019, Atlas Technical
Consultants, an environmental consultant hired by the Burlington
School District, performed bulk environmental sampling at BHS as
part of a planned campus renovation and demolition project.
Sampled materials included window and door caulking; expansion

---

[1] Although discussed in the briefing, Monsanto's "superseding
cause" argument is not asserted as a basis for granting summary
judgment.

joint caulking; window glazing materials; exterior brick; exterior concrete; interior plaster; gypsum wallboard; and concrete/slab foundations. Test results indicated the presence of PCBs in various building materials, with some levels exceeding the EPA regulatory limit of 50 ppm for PCB bulk product waste.

After PCBs were detected, the Burlington School District hired another environmental consultant, Fuss & O'Neill, to assist with project management. In September 2020, Fuss & O'Neill conducted indoor air sampling across Buildings A through F. Fourteen air samples were collected from Building A, revealing a median PCB air concentration level of 20.3 ng/m$^3$, and a mean concentration level of 50.3 ng/m$^3$. Five air samples were collected from Building B, wherein the median concentration level was 103 ng/m$^3$ and the mean concentration was 112 ng/m$^3$. In Building C, where seven air samples were tested, the median concentration level was 86.1 ng/m$^3$ and the mean level was 88.2 ng/m$^3$. Fuss & O'Neill tested another seven samples from Building D, finding a median PCB concentration level of 114 ng/m$^3$ and a mean concentration level of 129 ng/m$^3$. Eight samples from Building E showed a median PCB concentration level of 68.6 ng/m$^3$ and a mean concentration level of 69.6 ng/m$^3$. The highest PCB concentrations were found in Building F, where the mean level

measured 756 ng/m$^3$ and the median concentration level was 2010 ng/m$^3$.

Testing in other schools in Vermont also showed the presence of PCBs. In 2021, the Vermont Department of Health established levels for evaluating PCB levels in school air: a "Screening Level" of 15 ng/m$^3$; a "School Action Level" of 100 ng/m$^3$ for seventh grade and up; and an "Immediate Action Level" of 300 ng/m$^3$ prohibiting further use of a building. Applying those levels to the results found by Fuss & O'Neill, all six BHS buildings exceeded the Department of Health's Screening Level, Buildings B and D exceeded the School Action Level, and Building F exceeded the Immediate Action Level.

Monsanto challenges the usefulness of the Fuss & O'Neill data, arguing first that the extended closure of the school, combined with reduced ventilation during testing, impacted the readings. Monsanto also contends that Fuss & O'Neill targeted certain locations in order to generate worst-case concentrations. Monsanto submits that, given these issues, the readings obtained by Fuss & O'Neill do not reflect the concentrations that may have existed when Plaintiffs were present in the various school buildings.

Monsanto asserts similar criticisms of sampling work performed by Plaintiffs' expert Kevin Coghlan in 2023. Coghlan reported finding PCB levels as high as 160,000 to 500,000 parts

6

per million in caulk samples from Building F. Monsanto calls this result an outlier and argues that detections in bulk samples are not evidence of Plaintiffs' individual exposures. Monsanto also contends that in the rooms where Plaintiffs spent most of their time, most measurements "indicated only minimal PCB levels." ECF No. 250 at 14.

Josepha Austin claims to suffer from cognitive issues including memory loss, confusion and brain fog, and difficulties with decision-making and concentration. Austin reportedly spent most of her time at BHS in Building F. She also spent time in Buildings A, D, and E. Robin Cruz claims that she too suffers from cognitive issues, including memory loss, confusion, and brain fog. Cruz allegedly spent 20 hours per week in Building F during the 2015-2016 school year, and over an hour a day in Building F during the 2016-2017 school year. She spent the remainder of her time at BHS, from 2016 through January 2020, in Building D.

Jennifer Haselman claims that she has been diagnosed with Hashimoto's thyroiditis, and that she suffers from memory loss and other cognitive issues. She spent most of her time at BHS in Buildings D and F. Gordana Pobric has been diagnosed with Graves' Disease and associated conditions. Pobric worked primarily in Building E, but also spent time in Building F, particularly during summer school sessions from 2006 to 2008.

Each of the four Plaintiffs reportedly fears that PCB exposure increased their risk of developing cancer.

The Complaint asserts five causes of action. Count I alleges strict liability. Count II claims negligence. Count III asserts a cause of action for failure to warn. Count IV alleges misrepresentation. Count V, brought by former Plaintiff Robert Austin, alleges loss of consortium.[2] Plaintiffs are seeking damages, including punitive damages. Monsanto now moves for summary judgment on all Counts and claims for relief.

## Discussion

### I.    Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v.*

---

[2]  Monsanto asks the Court to enter summary judgment on Count V. Robert Austin has stipulated to his dismissal from the case with prejudice. ECF No. 56. Accordingly, no Plaintiff is currently pursuing relief under Count V, and summary judgment is not necessary. At the conclusion of the case, the Court will enter final judgment on Count V.

*Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see*
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)
(holding that a motion for summary judgment should be denied if
"the evidence is such that a reasonable jury could return a
verdict for the nonmoving party"). In determining whether
summary judgment is warranted, "the court's responsibility is
not to resolve disputed issues of fact but to assess whether
there are any factual issues to be tried, while resolving
ambiguities and drawing reasonable inferences against the moving
party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.
1986).

## II.  Causation

Monsanto first argues that Plaintiffs lack sufficient
admissible evidence to prove either general or specific
causation. With respect to general causation, Monsanto contends
that Plaintiffs have failed to identify the level of PCB
exposure likely to cause the injuries they allege. Monsanto is
particularly critical of the assertion by Plaintiffs' experts
that there is "no safe level" of PCB exposure, calling such
testimony "unscientific" and inadequate under Vermont law. ECF
No. 229 at 7. As to specific causation, Monsanto contends that
Plaintiffs lack sufficient evidence of their respective levels
of exposure.

Because the Court is asserting subject matter jurisdiction by virtue of the parties' diversity of citizenship, it must apply Vermont substantive law. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996) ("Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law."). The Vermont Supreme Court has held that to survive summary judgment in a toxic tort case, a plaintiff must be "able to point to evidence suggesting a probability, rather than a mere possibility, that (1) he was exposed to the specified chemical at a level that could have caused his physical condition (general causation); and (2) the exposure to that chemical did in fact result in the condition (specific causation)." *Blanchard v. Goodyear Tire & Rubber*, 2011 VT 85, ¶ 5 (citing *Golden v. CH2M Hill Hanford Group, Inc.*, 528 F.3d 681, 683 (9th Cir. 2008); *White v. Dow Chem. Co.*, 321 F. App'x 266, 273 (4th Cir. 2009); *Bland v. Verizon Wireless, (VAW) L.L.C.*, 538 F.3d 893, 898 (8th Cir. 2008)). These requirements are intended "to guard against raw speculation by the fact-finder." *Id.* (quoting *Sakaria v. Trans World Airlines*, 8 F.3d 164, 172–73 (4th Cir. 1993)).

General causation "addresses whether a substance is capable of causing a particular injury or condition in a population, while specific causation addresses whether a substance caused a particular individual's injury." *Id.*, ¶ 6 (quoting *King v.*

10

*Burlington Northern Santa Fe Ry.*, 762 N.W.2d 24, 34 (Neb. 2009)). For evidence of general causation, the Vermont Supreme Court has endorsed the use of epidemiological studies to "assess the existence and strength of associations between a suspected agent and a disease or condition." *Id.* With respect to specific causation, "plaintiffs in toxic exposure cases must . . . submit[] evidence concerning 'the amount, duration, intensity, and frequency of exposure.'" *Id.* (quoting *White*, 321 F. App'x at 273).

In *Blanchard*, the Vermont Supreme Court allowed that "in many, if not most, toxic tort cases it is impossible 'to quantify with hard proof — such as the presence of the alleged toxic substance in the plaintiff's blood or tissue — the precise amount of the toxic substance to which an individual plaintiff was exposed.'" *Id.*, ¶ 7 (quoting *Plourde v. Gladstone*, 190 F. Supp. 2d 708, 721 (D. Vt. 2002)). "Thus, expert testimony on toxic injuries may be admissible where dosage or exposure levels have been roughly established through reliable circumstantial evidence." *Id.* (quoting *Plourde*, 190 F. Supp. 2d at 721).

A.    **General Causation**

Monsanto contends that Plaintiffs' experts offer insufficient evidence of general causation, primarily because those experts have not identified a level of exposure that would cause the injuries being alleged. Monsanto highlights

11

Plaintiffs' submission that there is "no safe dose" of PCBs and
contends that such a theory is insufficient, in part because it
cannot be either proven or disproven. Monsanto argues that
without an identified threshold level at which PCBs can be
expected to cause the alleged harms, the assessment of general
causation requires improper "speculation by the fact-finder."
*Blanchard*, 2011 VT 85, ¶ 5.

In response, Plaintiffs focus on numerous studies showing
that PCBs can cause cognitive injury and thyroid disease, each
of which are alleged in this case. One of their designated
experts, Dr. Spaeth, states in his report that "[t]here is an
abundance of both experimental and epidemiological data
demonstrating that exposure to PCBs causes neurological,
neurocognitive and neuropsychiatric harm." ECF No. 243-47 at 32.
Plaintiffs cite other sources and studies showing that PCBs have
been linked to depression and fatigue as well as problems with
memory, concentration, motor skills, and executive function. ECF
Nos. 226-32 at 33-35, 229-17 at 26, 243-58 at 15-16. Impacts on
the thyroid have also been established, with one study
concluding that thyroid toxicity occurs "at an airborne
concentration that is 150 times lower than the levels the EPA
has derived for young school children." ECF No. 243-1 at 33-34.

With respect to the question of dose, Plaintiffs cite Dr.
Carpenter, who opined that "there is no threshold for PCB

12

exposure that does not have some biological and sometimes toxic effects. Even one molecule is going to alter expression of some genes." ECF No. 229-17 at 21.[3] Plaintiffs also cite federal regulatory sources, including a report on PCBs from the EPA, to support their assertion that there is no maximum safe dose. ECF No. 243 at 20 n.78. Low doses of exposure to PCBs have reportedly been shown to present risks, including impacts on the thyroid and nervous systems. ECF No. 243-47 at 47. Plaintiffs submit that their exposures to PCBs "far exceeded background and regulatory levels." ECF No. 243 at 20.

Both parties contend that the Vermont Supreme Court's opinion in *Blanchard* requires a ruling in their favor. As noted previously, with respect to general causation *Blanchard* held that a plaintiff must offer "evidence suggesting a probability, rather than a mere possibility," that she was exposed at a level that could have caused her condition. 2011 VT 85, ¶ 5. Monsanto contends that this "probability" requirement cannot be met by the mere assertion that there is no safe dose of PCB.[4] Plaintiffs

---

[3] Dr. Carpenter conceded that "[c]ertainly exposure to one molecule of PCBs is not going to cause disease." *Id.* None of the Plaintiffs base their claim of harm on exposure to a single molecule.

[4] Monsanto also argues that the Second Circuit has rejected the "no safe dose" approach to a causation analysis, citing *Wills v. Amerada Hess Corp.*, 379 F.3d 32 (2d Cir. 2004). In *Wills*, an expert sought to testify that the plaintiff's cancer could have been caused by a single exposure to certain toxic chemicals

13

counter that they have shown general causation through their experts' respective testimonies and citations to scientific evidence, that *Blanchard* endorsed the use of epidemiological studies to establish general causation, and that Vermont law does not require more.

In *Blanchard*, the Vermont Supreme Court affirmed summary judgment for the defendants where the plaintiff alleged his cancer was the result of playing on a ballfield – the site of a former Goodyear rubber manufacturing plant – contaminated with Benzene. *Id.*, ¶ 2. The court summarized the weaknesses in Plaintiff's evidence as follows:

> As plaintiff's own expert acknowledged, there is no way to know whether any benzene-containing product actually contaminated the ballfield. . . . But even if we were to assume that benzene-containing products made their way into the gully and through the field, there is no evidence indicating the amount or concentration of benzene that was present. Nor is there any evidence indicating plaintiff's level of exposure to any benzene that may have been present on the field. Nor is plaintiff able to point to studies indicating a risk of cancer posed by exposure to limited amounts of benzene from petroleum products in an outside environment.

*Id.*, ¶ 12. The court's observation about the lack of "studies" pertains directly to general causation. The remainder of the court's analysis pertains primarily to specific causation, as in

---

("benzene and PAHs"), regardless of dose. 379 F.3d at 49. In this case, Plaintiffs' experts do not rely on anything analogous to a single-dose theory.

its observation that plaintiff failed to provide evidence of benzene concentration at the site, or his level of exposure.

In contrast to the evidentiary presentation in *Blanchard*, Plaintiffs in this case reference numerous studies linking PCBs to their alleged illnesses, which include neurological and thyroid-related diseases. Moreover, there is no dispute that, unlike in *Blanchard*, PCBs were present at BHS. While *Blanchard* also requires a showing of exposure "at a level that could have caused [the plaintiff's] physical condition," the evidence in this case, when viewed in a light most favorable to the Plaintiffs, is that there is no generally established level at which PCBs cause harm, and that the scientific literature has shown harmful effects even at relatively low levels of exposure.

The case law cited by Monsanto does not require a ruling in its favor on general causation. *McMunn v. Babcock & Wilcox Power Generation Group, Inc.*, 869 F.3d 246 (3d Cir. 2017), focused on specific causation and the plaintiffs' failure to offer sufficient expert testimony about their individual exposures. *Id.* at 271-72. In *Blanchard v. Eli Lilly & Co.*, 207 F. Supp. 2d 308 (D. Vt. 2002), the plaintiff offered no epidemiological evidence, and the plaintiff's expert failed to show a causal relationship between Prozac and suicide. *Id.* at 322. In *Allen v. Pennsylvania Engineering Corp.*, 102 F.3d 194 (5th Cir. 1996), the court found no epidemiological evidence of a statistically

15

significant link between exposure to the chemical in question and human brain cancer. *Id.* at 199.

Here, Plaintiffs contend that their exposure levels were sufficient to establish a probability of harm, and that their claims are supported by expert testimony and the scientific literature. Given the standard of review at summary judgment, the Court finds that they have offered sufficient evidence of a probable link between PCBs and their injuries to create an issue of fact on the question of general causation.

### B.    Specific Causation

Whether Plaintiffs' exposures were significant enough to trigger their injuries is a question of specific causation. Monsanto again cites *Blanchard*, which requires evidence of "the amount, duration, intensity, and frequency of exposure." 2011 VT 85, ¶ 6. As noted previously, *Blanchard* does not require direct evidence of exposure such as blood or tissue testing. Instead, reliable circumstantial evidence may be used to "roughly establish[]" exposure levels. *Id.*, ¶ 7. *Blanchard* cautioned that such evidence must include "measurements of a plaintiff's exposure to the allegedly harmful substance." *Id.* (citation omitted).

In this case, Plaintiffs offer specific calculations of their alleged exposure levels, using air testing data from the various BHS buildings to measure intensity, and the time each

16

Plaintiff spent in those buildings to quantify frequency and
duration. As an example of such calculations, Plaintiffs submit
that Josepha Austin spent 4,364 hours in Building F, 1,891 hours
in Building A, and 766 hours in Building E. In 2020, testing
measured the average PCB exposure amount in Building F as 2,010
$ng/m^3$, Building A as 50.5 $ng/m^3$, and Building E as 89.3 $ng/m^3$.
The result in Building F exceeded the EPA evaluation level of
500 $ng/m^3$, and the Vermont Immediate Action Level of 300 $ng/m^3$.
That Immediate Action Level, when exceeded, forbids use of the
building. ECF No. 229-3 at 118. Plaintiffs' expert Coghlan
applied the standard adult ingestion rate of 14.6 milligrams of
dust per day and calculated that Austin ingested 1,100 ng of
PCBs per day (excluding the highest sample) in Building F alone.
*Id.* at 119. Similar calculations were made for Austin's time in
the other buildings, and Plaintiffs' experts performed these
same analyses for the other three Plaintiffs as well.

Monsanto argues that these calculations are both flawed and
insufficient. Monsanto criticizes Plaintiffs' experts, and
Coghlan in particular, for using building averages rather than
focusing on the rooms in which each Plaintiff taught. Monsanto
offers no authority for the proposition that a building average
renders Coghlan's calculations either unreliable or
inadmissible. As the Court found previously in denying
Monsanto's motion to exclude Coghlan as a witness, "[w]hile

17

Monsanto and its experts may argue that the use of averages is not adequate to prove individual exposure levels, those arguments again go to the weight of Coghlan's analysis rather than its admissibility." ECF No. 255 at 7; *see also* ECF No. 258 at 12 (concluding on reconsideration that "Plaintiffs have carried their burden with respect to Coghlan's use of reliable principles and methods"). Accordingly, the jury may decide whether Coghlan's analysis is worthy of its consideration.

Monsanto cites a Ninth Circuit Court of Appeals decision, *Abuan v. General Electric Company*, 3 F.3d 329 (9th Circ. 1993) as instructive. In *Abuan*, the plaintiffs' experts opined that plaintiffs were exposed to PCBs but offered no comparison of their varying levels of exposure. 3 F.3d at 334. "The experts simply concluded that the workers had been exposed and, as a group, were at risk for future injury and required medical monitoring. This testimony simply did not suffice to meet the requirements of each chosen cause of action." *Id.* The presentation of expert opinion evidence in this case, including calculations for each Plaintiffs' exposure, is significantly more thorough and precise than the evidence deemed inadequate in *Abuan*.

In addition to their presentation of exposure estimates, Plaintiffs offer proof of specific causation through differential diagnosis. As the Vermont Supreme Court explained

18

in *Blanchard*, "[d]ifferential diagnosis is a scientific analysis entailing the weighing of relevant evidence, listing all likely causes of the patient's observed symptoms or injury, then eliminating all but one cause." 2011 VT 85, ¶ 8 (citations and internal quotation marks omitted). *Blanchard* also cited *Plourde's* observation that "courts are reluctant to admit causation testimony based on a differential diagnosis where the proffered expert possesses only weak circumstantial evidence that some exposure occurred and makes no effort to scientifically evaluate or roughly estimate the degree of exposure or dosage." *Id.* (quoting *Plourde*, 190 F. Supp. 2d at 722).

As discussed, Plaintiffs have offered circumstantial evidence of exposure that is stronger than the evidence presented in *Blanchard*. They also present expert opinions on differential diagnosis for each Plaintiff. For Plaintiffs Austin, Cruz and Haselman, Dr. Spaeth and Dr. Morse each considered alternative etiologies and could not identify any that would explain Plaintiffs' range of symptoms. ECF No. 243-1 at 36-37, 39. Plaintiffs' experts reached a similar conclusion with respect to Pobric, noting that she has no family history of thyroid issues and is a lifelong nonsmoker. *Id.* at 38.

Monsanto challenges these differential diagnoses, primarily citing the testimony of Dr. Carpenter. Monsanto quotes Dr.

19

Carpenter's statement that the mechanism for Hashimoto's disease
(a thyroid condition) is "somewhat uncertain" and involves "a
lot of other factors." ECF No. 229 at 32 (quoting Dr.
Carpenter's deposition testimony). Dr. Carpenter also testified,
however, that "the evidence that PCBs exposure increases
Hashimoto's disease is very strong." ECF No. 229-16 at 7.
Monsanto also cites Dr. Carpenter's opinion that for
neurological issues such as depression, fatigue, memory
problems, and difficulties with concentration, it is "very
difficult" to rule out other causes. ECF No. 229 at 23 (quoting
Dr. Carpenter's deposition testimony). Dr. Carpenter also
testified that, while there may be many causes for a
neurological issue such as depression or anxiety, PCB exposure
would likely make such conditions worse. ECF No. 229-16 at 14.
The cited testimony of Dr. Carpenter did not directly address
the opinions of Drs. Spaeth and Morse, who reportedly looked at
other potential causes of Plaintiffs' conditions and could not
identify any, aside from exposures to PCBs, that would explain
their various symptoms.

As set forth above, the Court must assess Monsanto's motion
viewing the facts in a light most favorable to the Plaintiffs.
Applying that standard, and given the individualized
calculations of Plaintiffs' PCB exposures, the literature
regarding harms related to such exposures, and the experts'

conclusion after considering differential diagnoses, the Court finds there are genuine issues of material fact with respect to specific causation. Monsanto is thus not entitled to summary judgment on the basis of that issue.

## III. Duty to Warn

Monsanto next moves for summary judgment on specific causes of action, beginning with the duty to warn claim. In Vermont, a manufacturer has "a duty to warn users and consumers when it knows or has reason to know of dangers inherent in the product at the time the product is sold, Restatement (Second) of Torts § 402A cmt. k, or when the product is dangerous to an extent beyond that which would be contemplated by an ordinary consumer." *Webb v. Navistar Int'l Transp. Corp.*, 166 Vt. 119, 127 (1996). Plaintiffs allege that although Monsanto knew about the dangers of PCBs for many years, and even provided its workers with protective measures, it failed fulfill its duty to warn schools, teachers, and children. At summary judgment, Monsanto argues that (1) it owed no duty to the Plaintiffs, and (2) Vermont does not recognize a post-sale duty to warn.

### A. Bulk Supplier Doctrine/Sophisticated Purchaser Rule

With respect to its duty to warn, Monsanto asks the Court to invoke the bulk supplier doctrine. That doctrine stems from Restatement (Second) of Torts § 388, which states:

One who supplies directly or through a third person a
chattel for another to use is subject to liability to
those whom the supplier should expect to use the
chattel with the consent of the other or to be
endangered by its probable use, for physical harm
caused by the use of the chattel in the manner for
which and by a person for whose use it is supplied, if
the supplier

> (a) knows or has reason to know that the chattel
> is or is likely to be dangerous for the use for
> which it is supplied, and

> (b) has no reason to believe that those for
> whose use the chattel is supplied will realize
> its dangerous condition, and

> (c) fails to exercise reasonable care to inform
> them of its dangerous condition or of the facts
> which make it likely to be dangerous.

Restatement (Second) of Torts § 388. Comment n to Section 388

notes that when a product is "supplied for the use of others, .

. . the question may arise as to whether the person supplying

the chattel is exercising that reasonable care, which he owes to

those who are to use it, by informing the third person through

whom the chattel is supplied of its actual character."

Restatement (Second) of Torts § 388, comment n. The comment

discusses weighing the burden of providing the necessary

information with the extent to which the product is dangerous,

also taking into consideration the character of the third party

to whom it is sold.

> [W]hile it may be proper to permit a supplier to
> assume that one through whom he supplies a chattel
> which is only slightly dangerous will communicate the
> information given him to those who are to use it

22

unless he knows that the other is careless, it may be improper to permit him to trust the conveyance of the necessary information of the actual character of a highly dangerous article to a third person of whose character he knows nothing.

*Id.*

Courts have interpreted comment n as "relieving bulk suppliers of their duty to warn end users of a product as long as the bulk supplier has 'reasonable assurance that the information will reach those whose safety depends upon their having it.'" *Town of Westport v. Monsanto Co.*, No. CV 14-12041, 2017 WL 1347671, at *9 (D. Mass. Apr. 7, 2017), *aff'd*, 877 F.3d 58 (1st Cir. 2017) (quoting *Hoffman v. Houghton Chem. Corp.*, 434 Mass. 624, 632 (2001)). "[W]hen the supplier has reason to believe that the purchaser of the product will recognize the dangers associated with the product, no warnings are mandated." *Goodbar v. Whitehead Bros.*, 591 F. Supp. 552, 561 (W.D. Va. 1984), *aff'd sub nom. Beale v. Hardy*, 769 F.2d 213 (4th Cir. 1985). "Courts have described this basic analysis as the 'sophisticated purchaser' rule, the 'learned intermediary' rule, or the 'bulk supplier' rule. *In re TMJ Implants Prods. Liab. Litig.*, 872 F. Supp. 1019, 1029 (D. Minn. 1995). "As an affirmative defense, [Monsanto] bears the burden of proof in demonstrating that the bulk supplier doctrine is applicable here." *Town of Westport*, 2017 WL 1347671, at *9.

23

There is no indication that Vermont has adopted the bulk supplier doctrine or the sophisticated purchaser rule. The Second Circuit has noted that the duty to warn ultimate users of a product should fall on an intermediary, rather than on the manufacturer, only when the manufacturer can reasonably rely on the intermediary to provide the necessary information. *See In re Brooklyn Navy Yard Asbestos Litigation*, 971 F.2d 831 (2d Cir. 1992). In *Brooklyn Navy Yard*, the court found no evidence in the record that a manufacturer of asbestos "actually relied on the Navy to warn its workers, nor a finding that any such reliance would have been justifiable." *Id.* The court therefore held that "the presence of the Navy as an alleged 'sophisticated intermediary' or 'knowledgeable user' does not call into question the jury's finding of defendants' duty to warn." *Id.*

Here, Plaintiffs argue that Monsanto has failed to meet its burden because it has failed to identify any of the entities that used, or sold the products used, to construct BHS. Monsanto references certain past customers, including Dow Chemical, E.I. DuPont de Nemours, and General Electric, claiming they are "sophisticated customers." ECF No. 229 at 9. It also submits that it "provided warnings and technical information with PCBs to those sophisticated customers." *Id.* Monsanto does not, however, connect any of those "sophisticated customers" to BHS or the Plaintiffs in this case. Monsanto cannot show reasonable

24

reliance on an intermediary without identifying that
intermediary, and without offering evidence of the information
provided to the intermediary about PCBs.

Indeed, courts have determined that the question of
reasonable reliance is fact intensive, and that the relevant
factors may include:

> (1) the dangerous condition of the product; (2) the
> purpose for which the product is used; (3) the form of
> any warnings given; (4) the reliability of the third
> party as a conduit of necessary information about the
> product; (5) the magnitude of the risk involved; and
> (6) the burden imposed on the supplier by requiring
> that he directly warn all users.

*Genereux v. Am. Beryllia Corp.*, 577 F.3d 350, 374 (1st Cir.
2009) (quoting *Hoffman v. Houghton Chem. Corp.*, 751 N.E.2d 848,
854 (Mass. 2001)). In this case, the dangerous condition of the
product weighs against transferring the burden to an
intermediary. Moreover, the Court cannot assess the reliability
of the third party without knowing the identity of that party.
Based solely on the current record, and viewing the facts in
Plaintiffs' favor, these factors alone counsel against awarding
Monsanto summary judgment on the basis of either the bulk
supplier doctrine or the sophisticated purchaser defense.

**B.    Post-Sale Duty to Warn**

Monsanto next argues that Vermont has not adopted a post-
sale duty to warn, and that a federal court sitting in diversity
may not recognize a new state law cause of action. In *Webb*, the

25

Vermont Supreme Court cited Restatement (Second) of Torts § 402A
for the proposition that a manufacturer has a duty to warn when
it knows or has reason to know of dangers "inherent in the
product at the time the product is sold," or "when the product
is dangerous to an extent beyond that which would be
contemplated by an ordinary consumer." 166 Vt. at 127. Monsanto
construes the phrase "at the time the product is sold" as
limiting any duty to warn to the time of sale. Plaintiffs submit
that the phrase in question relates to the presence of a defect
or danger, and whether the manufacturer knew of that defect or
danger when the product was sold. According to Plaintiffs, the
phrase "at the time the product is sold" pertains only to when
the manufacturer was aware of a defect, and does not foreclose a
post-sale duty to warn. The Court agrees.

Monsanto cites Section 402A comment g, which states that
"[t]he seller is not liable when he delivers the product in a
safe condition, and subsequent mishandling or other causes make
it harmful by the time it is consumed." Restatement (Second) of
Torts § 402A cmt. g (1965). Monsanto cites nothing within
Section 402A – either the main text or the comments – stating
that the duty to warn ends at sale if the product itself is
unsafe. In fact, courts have concluded that "[a] manufacturer's
post-sale duty to warn is derived from . . . Section 402A."

26

*DeSantis v. Frick Co.*, 745 A.2d 624, 628 (Pa. Super. 1999) (citing *Walton v. Avco Corp.*, 610 A.2d 454, 458 (Pa. 1992)).

Vermont has adopted Section 402A of the Restatement, and the Court would not be creating a new cause of action by simply adhering to its plain text. A plain reading of that text suggests a duty to warn if the manufacturer knew of a defect at the time of sale. The Restatement does not state, or even suggest, that the duty to warn ends at that time.[5] Monsanto's motion for summary judgment based on its claim of no post-sale duty to warn is therefore denied.

## IV. **Misrepresentation**

Monsanto previously moved to dismiss Plaintiffs' misrepresentation claim. The Court denied the motion, holding in part that Plaintiffs had alleged a plausible claim of reliance on Monsanto's duty to disclose certain information. Monsanto now argues that Vermont law requires actual reliance, and that Plaintiffs' evidence falls short of that standard.

Monsanto relies primarily on *Glassford v. Dufresne & Associates*, which held that reliance occurs "when a

---

[5] If the Court found that it needed to predict the Vermont Supreme Court's view of the post-sale duty to warn, it would not only reference Section 402A, but would also note that "some version of a post-sale duty to warn has been adopted in over 30 states." *King v. Flinn & Dreffein Eng'g Co.*, No. 7:09-CV-00410, 2012 WL 4459568, at *7 (W.D. Va. May 16, 2012).

misrepresentation is an immediate cause of a plaintiff's
conduct, which alters [the plaintiff's] legal relations." 2015
VT 77, ¶ 28. In *Glassford*, the Vermont Supreme Court considered
home buyers' reliance on a wastewater certification submitted to
the State. The court noted that "[t]he necessary piece in this
puzzle is that the plaintiff actually received or was made aware
of the false statements [in the certificate] and directly relied
on those false statements." *Id.*, ¶ 23. Concluding that the
plaintiffs "never actually viewed the certificate," the court
held that "indirect reliance is insufficient to render defendant
liable for its allegedly false information." *Id.*, ¶ 24.

As this Court observed in its ruling on the motion to
dismiss, this case differs from *Glassford* in that, here, the
parties relied upon omissions rather than statements. And as the
Court opined in a separate case involving the presence of PCBs
at BHS, "[t]hose omissions occurred initially at the time of
construction, and the duty to disclose arguably increased as
Defendants' knowledge about PCBs developed." *Rubman et al. v.
Bayer AG et al.*, Case No. 2:22-cv-181, ECF No. 65 at 11. With
respect to reliance, Plaintiffs attest that they would not have
exposed themselves to the air and dust at BHS had they known of
the buildings' contamination.

Plaintiffs cite Restatement (Second) of Torts § 311(1),
which states that "[o]ne who negligently gives false information

28

to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information where such harm results . . . to such other third person as the actor should expect to be put in peril by the action taken . . . ." In the context of this case, Plaintiffs claim that Monsanto, as the alleged furnisher of false or insufficient information, may now be held liable for physical harm resulting from actions by others, including the Burlington School Department, in reasonable reliance on those misrepresentations or omissions. *See* Restatement (Second) of Torts § 311(1); *see also id.* § 310 comment d ("a misrepresentation of the physical condition of a chattel . . . , whether by express words or concealment, may make a vendor liable . . . .").

Although the Vermont Supreme Court has not adopted Sections 310 and 311 of the Restatement (Second), Judge Crawford recently concluded that "§§ 310 and 311 provide clear guidance to the direction of modern tort law and are likely to be seen in that light by the Vermont Supreme Court." *Crawford v. Monsanto Co.*, No. 2:23-CV-752, 2024 WL 5629411, at *9 (D. Vt. Dec. 19, 2024); *see also id.* at *10 ("The court is confident that its forecast on this limited question remains within the scope of permissible and necessary prediction by a federal court of the direction of state common law."). Judge Crawford also concluded, when

29

assessing similar facts, that "it is a reasonable inference that
a school district, properly informed about the toxic risk of
PCBs in a building component such as window caulk, would not
incorporate the product into the construction of a school." *Id.*
at *11.

Adopting Judge Crawford's conclusion on the question of
Vermont law, the Court finds Plaintiffs have created a genuine
issue of material fact as to reasonable reliance. Plaintiffs
have evidence that Monsanto knew PCBs were dangerous yet failed
to warn of those dangers. Burlington School Department, among
others, relied on the information provided, and Plaintiffs were
allegedly injured as a result. Plaintiffs, too, relied on the
building being safe from contamination. Monsanto's motion for
summary judgment on Plaintiffs' misrepresentation claim is
therefore denied.

## V. Manufacturing Defect

Monsanto asks the Court to enter summary judgment in its
favor on Plaintiffs' manufacturing defect claim, arguing
Plaintiffs have no evidence that PCBs deviated from the intended
design. The Vermont Supreme Court, quoting Restatement (Second)
of Torts § 402A comments, has explained that a "product is
defective if it is not 'safe for normal handling and
consumption.' Further, 'unreasonably dangerous' means the
product is 'dangerous to an extent beyond that which would be

30

contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.'" *Farnham v. Bombardier, Inc.*, 161 Vt. 619, 620 (1994) (quoting Restatement (Second) of Torts § 402A, comments h, i). Vermont law does not require a showing that a product deviated from its original design. Instead, the design itself may be defective. *See id.* (plaintiff must show that "the defendant's product . . . caused injury to the consumer because of its defective design").

In this case, Plaintiffs have offered evidence that PCBs are unsafe for normal use, thus creating a genuine issue of material fact with respect to their claim of a manufacturing defect. Monsanto's motion for summary judgment on Plaintiffs' defective design claim is denied.

## VI.  Punitive Damages

Plaintiffs are seeking punitive damages. In Vermont, "[p]unitive damages are reserved for especially egregious conduct." *Connors v. Dartmouth Hitchcock Med. Ctr.*, 12 F. Supp. 3d 688, 695 (D. Vt. 2014). "[T]he purpose of punitive damages is to punish conduct that is morally culpable to the degree of outrage frequently associated with crime." *Fly Fish Vermont, Inc. v. Chapin Hill Estates, Inc.*, 2010 VT 33, ¶ 19 (citing *Brueckner v. Norwich Univ.*, 169 Vt. 118, 129 (1999)). To be eligible for an award of punitive damages, Plaintiffs must

satisfy two elements: "wrongful conduct that is outrageously reprehensible" and "malice, defined variously as bad motive, ill will, personal spite or hatred, reckless disregard, and the like." *Id.* ¶ 18. The "conduct need not only be wrongful, but truly reprehensible," and malice must be proven by "some showing of bad motive." Id. ¶ 19 (quotation omitted and emphasis added); *see Beaudoin on Behalf of New England Expedition Ltd. P'ship II v. Feldman*, 2018 VT 83, ¶ 18.

In moving for summary judgment on Plaintiffs' request for punitive damages, Monsanto first argues that because post-sale failure to warn is not a recognized cause of action in Vermont, awarding punitive damages in conjunction with that claim would violate its right to due process. As explained above, however, the Court finds that a post-sale duty to warn is cognizable in Vermont, particularly after the Vermont Supreme Court's adoption of Restatement § 402A. More specifically, Vermont law includes a duty to warn even after a dangerous product leaves the seller's hands. *See* Restatement (Second) of Torts § 402A, comments g and k. Consequently, there can be no due process violation if the jury decides to award punitive damages in conjunction with that claim.

Monsanto also argues that Plaintiffs have not offered sufficient evidence to support a punitive damages award. Plaintiffs' briefing highlights some of the evidence they intend

to introduce at trial, which reportedly includes: that Monsanto
knew of the systemic toxic effects of PCBs as early as the
1930s; that its own medical staff confirmed in the 1950s that
Aroclors are toxic; that the Navy declined a Monsanto bid due to
the perceived toxic effects of an Aroclor component; and that
Monsanto nonetheless decided to "sell the hell out of [PCBs] as
long as we can and do nothing else." ECF No. 243-33 at 6 (PCB
Committee Notes from August 24, 1969).

The Court finds that the evidence, when viewed in a light
most favorable to the Plaintiffs, creates a genuine issue of
material fact on the question of punitive damages. Vermont
allows such an award when the defendant "acted, or failed to
act, in conscious and deliberate disregard of a known,
substantial and intolerable risk of harm to plaintiff, with the
knowledge that the acts or omissions were substantially certain
to result in the threatened harm." *Fly Fish Vermont, Inc.*, 2010
VT 33, ¶ 25. Monsanto contends that its knowledge of PCB
toxicity prior to the construction of BHS did not meet this
standard. Some of Plaintiffs' evidence, however, pre-dates the
construction of BHS. The evidence also suggests that Monsanto
prioritized profits over public health despite its knowledge
that PCBs posed certain threats. The Court finds that a
reasonable jury, if presented with such evidence, could find

both reprehensible conduct and sufficient bad motive to support an award of punitive damages.

## VII. Risk of Future Injuries

Plaintiffs claim they are entitled to recover for an increased risk of developing cancer in the future and for the fear associated with such risk. Monsanto moves for summary judgment on this claim. For support, Monsanto cites *Howley v. Cantor*, 163 A. 628, 631 (Vt. 1933), which requires evidence supporting damages for future injury to "be of such a character that the jury can find that there is a reasonable certainty or a reasonable probability that the apprehended future consequences will ensue from the original injury." The Vermont Supreme Court also held that "[c]onsequences which are contingent, speculative, or merely possible are not entitled to consideration in ascertaining the damages." *Howley*, 163 A. at 631.

Dr. Spaeth concluded to a reasonable degree of medical certainty that Plaintiffs' exposure to PCBs puts them at greater risk of developing cancer in the future. *See, e.g.,* ECF Nos. 243-47 at 48, 243-50 at 46-47, 243-71 at 50. These conclusions stand in stark contrast to the evidence presented in *Howley*, where the plaintiff's expert testified that his opinion was "pure speculation." *Id.* While the testimony of Plaintiffs' expert may not align precisely with the *Howley* "reasonable

certainty or a reasonable probability" standard, it suggests that Plaintiffs have reason to believe that due to their exposure to PCBs, their likelihood of contracting cancer is heightened.

Plaintiffs are suing not just for the possibility of future injury, but also for their current fear of developing cancer. In a case involving asbestos exposure, the United States Supreme Court affirmed a plaintiff's ability "to seek compensation for fear of cancer as an element of his asbestosis-related pain and suffering damages. It is incumbent upon such a complainant, however, to prove that his alleged fear is genuine and serious." *Norfolk & W. Ry. Co. v. Ayers*, 538 U.S. 135, 157 (2003); *see also Clark v. Taylor*, 710 F.2d 4, 14 (1st Cir. 1983). The testimony of Plaintiffs' experts is sufficient to create a question of fact about whether Plaintiffs' fear of contracting cancer is genuine and serious. The Court therefore declines to dismiss their claim at summary judgment.

### Conclusion

For the reasons set forth above, Monsanto's motion for summary judgment (ECF No. 229) is denied.

DATED at Burlington, in the District of Vermont, this 24th day of February 2026.

/s/ William K. Sessions III
Hon. William K. Sessions III
U.S. District Court Judge